**AFFIDAVIT**

STATE OF WEST VIRGINIA    )
                          )
COUNTY OF KANAWHA         )

I, Adam D. Bennett, being first duly sworn, do hereby depose and state that as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.   I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the wireless telephones described in Attachment A which are currently in law enforcement possession, and the extraction from those wireless telephones of electronically stored information described in Attachment B.

2.   I am a Special Agent of the Federal Bureau of Investigation (hereinafter "FBI") and have been so employed since March, 2012.  I am currently assigned to the FBI office in Huntington, West Virginia.  I completed five months training at the FBI Academy in Quantico, Virginia, where I learned the skills necessary to conduct federal criminal investigations, including investigating crime scenes, interviewing witnesses and suspects, and writing reports and affidavits.  I have also received specialized training to include the Department of Justice Asset Forfeiture and Money Laundering Section (AFMLS)

Financial Investigations Seminar, as well as the AFMLS Basic Organized Crime Drug Enforcement Task Force Financial Investigations Seminar. I have experience investigating complex drug trafficking organizations, bank robberies, and child exploitation, as well as other violations of federal law. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).

3. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. Summaries of recorded conversations are based on draft transcripts of those conversations. This Affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this investigation.

## IDENTIFICATION OF PROPERTY TO BE SEARCHED

4. The property to be searched is one Silver and White iPhone Model A1586 with a cracked screen (hereinafter "Phone 1"), one grey Apple iPhone Model A1429 (hereinafter "Phone 2"), one silver Apple iPhone Model A1533 (hereinafter "Phone 3"), one Black ZTE cell phone (hereinafter "Phone 4"), and one LG cell phone (hereinafter "Phone 5") (hereinafter collectively "wireless telephones"). The aforementioned wireless telephones

are currently in the possession of the FBI at 113 Virginia Street East, Charleston, West Virginia, 25301.

5.     The applied-for warrant would authorize the forensic examination of the wireless telephone for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.     On July 8, 2019, investigators received authorization from United States District Judge Robert C. Chambers to intercept communications occurring over a telephone utilized by GEORGE LANGFORD (hereinafter "LANGFORD"), telephone number (304) 373-8955.  LANGFORD is a methamphetamine and heroin dealer from Akron, Ohio, who distributed methamphetamine in the Southern District of West Virginia.

7.     On August 6, 2019, investigators received authorization from United States District Judge Robert C. Chambers to continue to intercept communications occurring over the telephone utilized by LANGFORD, telephone number (304) 989-1739.[1]

---

[1]     On August 5, 2019, the number for the telephone was changed from (304) 373-8955 to (304) 989-1739.  Subscriber records indicate that although the phone number was changed, the IMSI, subscriber information, and billing information remained the same.

8.   On   August   30,   2019,   investigators   received authorization   from   United   States   District   Judge   Robert   C. Chambers to continue to intercept communications occurring over the telephone utilized by LANGFORD, telephone number (304) 989-1739.   Investigators   also   received   authorization   to   intercept communications occurring over a separate telephone also utilized by LANGFORD, telephone number (323) 861-6640.

9.   During   the   course   of   interceptions,   it   was   discovered LANGFORD   was   communicating   with   other   individuals   over   both telephones regarding the distribution of methamphetamine.

10.   For example, on August 7, 2019, at approximately 1:17 p.m.,   LANGFORD   utilized   telephone   number   (304)   989-1739   to contact LAMARK GLOVER (hereinafter "GLOVER").   The following was discussed:

LANGFORD:       Hey, what you bout to, uh, you still got
                some zips?

GLOVER:         Yeah.

LANGFORD:       I'm trying to get some bro, or we can pull
                up or something. I got, I got half on
                something.

GLOVER:         Alright.

11. Based on my training and experience and the facts of the investigation this far, this conversation is in regards to LANGFORD asking GLOVER if he has any methamphetamine.   LANGFORD asks GLOVER if he has any methamphetamine portioned out in ounce

quantities (Hey, what you bout to, uh, you still got some zips?).   GLOVER responds affirmatively.   LANGFORD then tells GLOVER that he would like to either buy the methamphetamine from GLOVER, or split the cost of a new supply of methamphetamine (I'm trying to get some bro, or we can pull up or something. I got, I got half on something.).   GLOVER agrees (Alright.)

   12.   On August 8, 2019, at approximately 1:17 p.m., LANGFORD again utilized telephone number (304) 989-1739 to contact GLOVER.   The following was discussed:

| | |
|---|---|
| GLOVER: | What's up bro? |
| LANGFORD: | Shit, what's up? What happened? |
| GLOVER: | Shit, they coming down here. |
| LANGFORD: | They bringing the drink too? |
| GLOVER: | Yeah. |
| LANGFORD: | And the stick? |
| GLOVER: | Yeah, bro. He only bringing one. Only one for me. |
| LANGFORD: | Damn, bro. I thought you said I could get it. |
| GLOVER: | Nah. |
| LANGFORD: | So, so, so you bout to have two? |
| GLOVER: | Yeah, imma sell you mines. |
| LANGFORD: | Alright, what you want for yours? |
| GLOVER: | 400. |
| LANGFORD: | Damn, bro. |

GLOVER:           What you mean bro? The same way how you be
                  doing on the bag. You get the bag, make your
                  little pros. I gotta make something bro.

LANGFORD:         I charge ya niggas 3 bands, nigga. Fuck is
                  you talking about?

GLOVER:           You right, you right. You have been charging
                  me 3. Bro, you right.

13.  Based on my training and experience, and the facts of
this investigation thus far, I believe this conversation
involves GLOVER telling LANGFORD that he needs to make some
profit from his sale of a firearm to LANGFORD, just like
LANGFORD makes a profit from his sale of methamphetamine to
GLOVER.  LANGFORD asks GLOVER how much he is willing to sell the
firearm for (Alright, what you want for yours?), and GLOVER says
$400.  LANGFORD expresses that the price is high (Damn, bro.),
and GLOVER responds that he has to make a profit from the sale
just like LANGFORD makes a profit when he sells GLOVER
methamphetamine (What you mean bro? The same way how you be
doing on the bag. You get the bag, make your little pros. I
gotta make something bro.).  LANGFORD states that he charges
GLOVER $3,000 for a pound of methamphetamine (I charge ya niggas
3 bands, nigga. Fuck is you talking about?).  GLOVER agrees with
LANGFORD's statement (You right, you right. You have been
charging me 3. Bro, you right.).

14. On August 9, 2019, at approximately 11:31 a.m., CALVIN EUGENE WELLS, JR., contacted LANGFORD on (304) 989-1739.[2] During this communication, at approximately 11:37 a.m., an unidentified individual (hereinafter "THE INDIVIDUAL") contacted LANGFORD on (323) 861-6640.[3] LANGFORD then made a three-way call from (323) 861-6640 to (304) 989-1739 to allow WELLS and the individual to communicate. The toll records for (323) 861-6640 corroborate the format of this call. The toll records show that LANGFORD received a call on (323) 861-6640 from telephone number (419) 520-9343 at approximately 11:36 a.m. on August 9, 2019. The tolls record also show that LANGFORD made an outgoing call from (323) 861-6640 to (304) 989-1739 at 11:37 a.m. on August 9, 2019. Additionally, while investigators were monitoring the initial call from WELLS to LANGFORD on (304) 989-1739, LANGFORD

---

[2] WELLS contacted LANGFORD from the South Central Regional Jail where he was incarcerated using the jail's inmate telephone system.

[3] Investigators believe this individual was incarcerated at the Mansfield, Ohio Correctional Institution and was using the facility's inmate telephone system because investigators could hear in the background, while monitoring the call between WELLS and LANGFORD on (304) 989-1739, the following automated disclaimer at the beginning of the call between THE INDIVIDUAL and LANGFORD on (323) 861-6640: "Hello, this a prepaid debit call from (unintelligible), an inmate in the Mansfield Correctional Institution. To accept this call, press 0. To refuse this call press 0. This call is from a correctional facility and is subject to monitoring and recording. Thank you for using GTL."

is heard answering the phone call on (323) 861-6640 in the background at approximately 11:36 a.m. after investigators heard the phone ring followed by the automated disclaimer referenced above. During the three-way call, the following was discussed:

THE INDIVIDUAL:    You still down, you still down the way?

WELLS:             Hell yeah.

THE INDIVIDUAL:    Man, bruh, (unintelligible) my nigga, man.

WELLS: What's up with you, man?

THE INDIVIDUAL:    Man, trying to, trying to get a zip of this Jerry Rice. This nigga, trying to see what this nigga bout to do.

WELLS:             Oh, yeah.

THE INDIVIDUAL:    Yeah, man.

(AUTOMATED MESSAGE: This call is originating from an Ohio correctional facility and may be recorded and monitored.)

WELLS:             It should be later, we waiting bitch. It should be later.

THE INDIVIDUAL:    You said it should be later?

LANGFORD:          Yeah.

WELLS:             We waiting, we all waiting. I'm waiting too.

THE INDIVIDUAL:    What's it called, you don't, oh yeah, I forgot, you don't fuck with what's a name or nothing?

WELLS:             Who?

THE INDIVIDUAL:    The nigga uh, the nigga, (unintelligible).

LANGFORD:           Man, shut up, man. You don't know who
                    we fuck with.

THE INDIVIDUAL:     I'm saying though, I just been hearing
                    his name on that, on that other, on
                    that. Cause I'm trying to, I'm trying
                    to put something together, man. That's
                    what I'm trying to do.  You trying to.

LANGFORD:           You always trying to put something
                    together, bitch.

WELLS:              We got you, bro, we just told told you
                    that.

THE INDIVIDUAL:     No, this nigga George be doing some
                    weird ass shit playing all the time.
                    Nobody got time to keep on listening to
                    the train when it's, when it's time to
                    rode up, nigga. Fuck is you talking
                    about, nigga.

LANGFORD:           Bro, nigga you missed the train. You
                    gave nigga, I just sent you some money,
                    nigga you let some niggas run off on
                    you. Shut up, bitch.

THE INDIVIDUAL:     Man, I, man, hey, what, what I, what
                    can I do?

LANGFORD:           Man, hey.

THE INDIVIDUAL:     I ain't even talking about no chicken
                    right now. I'm talking, I'm talking
                    bout some, I'm talking bout some of the
                    Jerry Rice.  I ain't talking bout no .
                    . .

LANGFORD:           We told you, bro.  When it come in, we
                    got you, boy, damn.

WELLS:              We got you, bro.  I just told
                    (unintelligible).  We got you, bro.

15. Based on my training and experience, and the facts of
this investigation thus far, I believe this conversation

involves WELLS, THE INDIVIDUAL, and LANGFORD discussing when the shipment of narcotics was going to arrive. THE INDIVIDUAL, who investigators believe was incarcerated at an Ohio correctional facility, asks WELLS when he can receive an ounce of the narcotics (Man, trying to, trying to get a zip of this Jerry Rice. This nigga, trying to see what this nigga bout to do.). WELLS replies that the narcotics should be arriving soon, and both him and LANGFORD are waiting as well (It should be later, we waiting bitch. It should be later.). THE INDIVIDUAL then asks about the identity of WELLS's source of supply (What's it called, you don't, oh yeah, I forgot, you don't fuck with what's a name or nothing?) LANGFORD responds that THE INDIVIDUAL does not know who their source of supply is (Man, shut up, man. You don't know who we fuck with.). THE INDIVIDUAL tells WELLS and LANGFORD that he is just trying to figure out a way to get his narcotics to distribute (Cause I'm trying to, I'm trying to put something together, man. That's what I'm trying to do. You trying to.). LANGFORD later states that he will let THE INDIVIDUAL know when the narcotics arrive (We told you, bro. When it come in, we got you, boy, damn.).

16. On September 24, 2019, a grand jury returned an indictment charging LANGFORD, GLOVER, WELLS, along with six other individuals, with various controlled substance offenses. LANGFORD was named in three counts and charged with conspiracy

to distribute methamphetamine and heroin in violation of 21 U.S.C. § 846, and two counts of using a communication facility in committing, causing, and facilitating a felony controlled substance offense in violation of 21 U.S.C. § 843(b).

17. In addition, on September 24, 2019, United States Magistrate Judge for the Northern District of Ohio Kathleen Burke issued search warrants for LANGFORD's residence located at 2131 Copley Road, Apartment A32, Copley, Ohio 44320 (hereinafter "the Copley Road residence"), and a residence used by LANGFORD located at 957 Bank Street, Akron, Ohio 44305 (hereinafter "the Bank Street residence"). The executed Applications and Affidavit for said search warrants are attached and incorporated herein as Exhibit 1.

18. Prior to the execution of the search warrant for the Copley Road residence on September 25, 2019, LANGFORD was observed leaving the residence in a vehicle. A marked unit with the Akron Police Department conducted a traffic stop and Langford was arrested. During the arrest, investigators seized Phone 1 from LANGFORD's person. Phone 1 was subsequently transported and stored in the Akron Resident Agency of the FBI located at 222 South Main Street, Suite 210, Akron, Ohio 44308. Investigators conducting the search of the Copley Road residence seized a number of items including the following: approximately $620.00 in United States currency, a loaded Glock model 22

handgun with a partially full 22 round magazine, approximately 133.13 grams of fentanyl, and approximately 63.5 grams of suspected methamphetamine.

19. On September 25, 2019, investigators also executed the search warrant for the Bank Street residence. During the search, investigators seized Phone 2, Phone 3, Phone 4 and Phone 5 from the Bank Street Residence. Phone 2, Phone 3, Phone 4, and Phone 5 were subsequently transported and stored in the Akron Resident Agency of the FBI located at 222 South Main Street, Suite 210, Akron, Ohio 44308. Investigators conducting the search of the Bank Street residence also seized a number of additional items including the following: a Glock model 26 handgun, a 9mm Magazine with 9mm ammunition, approximately 133 grams of suspected methamphetamine, approximately 32.5 grams of suspected methamphetamine, and approximately 7 grams of methamphetamine

20. On January 15, 2020, a grand jury returned a second superseding indictment charging LANGFORD, GLOVER, and WELLS again with various controlled substance offense. LANGFORD was named in four counts and charged with conspiracy to distribute methamphetamine and heroin in violation of 21 U.S.C. § 846, aiding and abetting the possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and two counts of using a communication facility in

committing, causing, and facilitating a felony controlled substance offense in violation of 21 U.S.C. § 843(b) .

21. On March 17, 2020, the wireless telephones were received by the Charleston Resident Agency Evidence Control Room located 113 Virginia Street, Charleston, West Virginia 25301, and are currently located within the Southern District of West Virginia. In my training and experience, I know that the wireless telephones have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the wireless telephones first came into the possession of the FBI.

22. Based on my training and experience, I know the following pertaining to controlled substance investigations:

a. It is common for unlawful distributors of controlled substances to use wireless telephone to send and receive text messages with other distributors and/or customers and maintain contact lists within wireless telephones to facilitate their unlawful drug activities;

b. It is common for unlawful distributors of controlled substances to use wireless telephones for the following reasons, including: 1) to arrange unlawful drug transactions; 2) to facilitate unlawful drug transactions; and 3) to communicate with other members of their unlawful drug

organizations concerning matters related to their unlawful drug activities;

c. It is common for unlawful distributors of controlled substances to coordinate with their source(s) of supply and other members of the drug organization through the use of wireless telephones. Wireless telephones are particularly valuable to unlawful distributors of controlled substances to facilitate their unlawful activities because of a common belief that law enforcement has greater difficulty "tracking" wireless telephones and monitoring conversations over wireless telephones than traditional land-line phones. In addition, wireless telephones can be disposed of easily and this fact emboldens unlawful distributors of controlled substances to use such portable devices to facilitate their unlawful activities. This is particularly true in cases when the "source" city where the controlled substances are obtained is different than the city where the controlled substances are distributed. In such cases, based on the distance between the source city and the distribution areas, members of the organization generally cannot meet at a common destination and engage in face-to-face conversations to coordinate and conduct drug-related business;

d. It is common for unlawful distributors of controlled substances to store persons' names and their

corresponding phone numbers, and addresses of those who are involved in their drug trafficking operations in wireless telephones' contact list.

       e. It is common for unlawful distributors of controlled substances to maintain photographs and video on wireless telephones that capture members of the unlawful drug organization, members of the unlawful drug organization in the presence of drug proceeds, and members of the unlawful drug organization in the presence of firearms used to facilitate their drug trafficking activities. Many of the aforementioned photographs and video are considered "self-aggrandizing" portraits where unlawful distributors of controlled substances pose with United States currency to demonstrate the prosperity of their unlawful drug activities and pose with firearms to demonstrate the "fire-power" they possess to facilitate their unlawful drug activities; and,

       f. It is common for unlawful distributors of controlled substances to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, as well as notations and records of their drug transactions. This information is maintained by the narcotics traffickers within their residences, or other locations, which they maintain dominion and control over, including wireless telephones.

23.  The wireless telephones are currently in storage at 113 Virginia Street East, Charleston, West Virginia, 25301.  In my training and experience, I know that wireless telephones were been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when Phone 1, Phone 2, Phone 3, Phone 4 and Phone 5 first came into the possession of the FBI.

### TECHNICAL TERMS

24.  Based on my training and experience, I use the term "wireless telephone" to convey the following meanings:  a wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates,

appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

25. Based on my training and experience I know that the wireless telephones have capabilities that allow it to serve as a wireless telephone. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that the wireless telephones can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the wireless telephones. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable

cause to believe that this forensic electronic evidence might be on the wireless telephones because:

a. Data on a wireless telephone can provide evidence of a file that was once on a wireless telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a wireless telephone can also indicate who has used or controlled the wireless telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b. A person with appropriate familiarity with how a wireless telephone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how a wireless telephone was used, the purpose of its use, who used it, and when.

c. The process of identifying the exact electronically stored information on a wireless telephone that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a wireless telephone is evidence may depend on other information stored on the wireless telephone and the application of knowledge about how a wireless

telephone behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.   Further, in finding evidence of how a wireless telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a wireless telephone.

28. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the wireless telephones consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of each entire Device, that might expose many parts of the wireless telephones to human inspection in order to determine whether it is evidence described by the warrant.

29. Because this warrant seeks only permission to examine the wireless telephones, which are already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Phone 1,

Phone 2, Phone 3, Phone 4 and Phone 5 described in Attachment A to seek the items described in Attachment B.

_____
Adam D. Bennett, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence this 19th day of March, 2020.

_____
DWANE L. TINSLEY
United States Magistrate Judge

AO 106 (Rev. 04/10)  Application for a Search Warrant

**EXHIBIT 1**

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

**FILED**

**SEP 2 4 2019**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| 2131 Copley Road, Apartment A32, Copley, OH 44320 | ) |
| and curtilage thereto | ) |

Case No.  5:19MJ1295

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
As Set Forth in Attachment A

located in the _____Northern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:
As Set Forth in Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| 21 U.S.C., Section 841(a)(1) | - knowingly and intentionally distributing and possessing with the intent to distribute a controlled substance |
| 21 U.S.C., Section 846 | - conspiracy to distribute with the intent to distribute a controlled substance |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of \_\_\_\_\_ days (give exact ending date if more than 30 days _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Christopher Fassler, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/24/19

*Judge's signature*

City and state:  Akron, Ohio

Kathleen B. Burke, U.S. Magistrate Judge
*Printed name and title*

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

**FILED**

**SEP 24 2019**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

957 BANK STREET, AKRON, OH 44305 AND
CURTILAGE THERETO

)
)
)
)
)
)

Case No.  5:19MJ1296

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
As Set Forth in Attachment A

located in the _____ Northern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:
As Set Forth in Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C., Section 841(a)(1) | - knowingly and intentionally distributing and possessing with the intent to distribute a controlled substance |
| 21 U.S.C., Section 846 | - conspiracy to distribute with the intent to distribute a controlled substance |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Christopher Fassler, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/24/19

*Judge's signature*

City and state:  Akron, Ohio

Kathleen B. Burke, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Christopher Fassler, being duly sworn depose and state as follows:

1.    I am an "Investigative or Law Enforcement Officer" within the meaning of Title 18, United States Code, Section 2510(7) as a Special Agent (SA) of the FBI. I am empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.    I have been employed by the FBI since March of 2011, and have been assigned to the Cleveland Division, Akron Resident Agency, since August 2011 where I am detailed to the Akron Area Safe Street Task Force (AKRSS). I have gained experience through training at the FBI Academy in Quantico, Virginia and everyday work relating to conducting these types of investigations. Based on my training and experience in these positions, I know the following:

    a. That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

    b. That drug traffickers very often place assets in the names of corporate entities in order to avoid detection of these assets by government agencies;

1

c. That even though these assets are in other person's names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

d. That drug traffickers often place drugs and assets in hidden locations, known as "safe houses", to protect and conceal the location from government agencies;

e. That large-scale narcotic traffickers usually maintain on hand (including in their homes) large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

f. That narcotic traffickers often maintain books, records, receipts, ledgers, airline tickets, and money orders to assist in the distribution of controlled substances;

g. That narcotic traffickers usually provide narcotics on consignment to their associates and maintain records through receipts, notes, and ledgers that are easily accessible to the traffickers;

h. That narcotic dealers often process or "cut" their product by diluting the drugs with other substances in order to maximize their profit;

i. That it is common for large-scale drug traffickers to secret contraband, proceeds of drug sales, and records of drug transactions in secure locations within their

residence and/or business for their ready access and to conceal from law enforcement authorities;

j. That it is common for large-scale drug traffickers to maintain firearms on their person, in their homes, and/or in their stash houses in order to protect their drug supply and/or the proceeds of their drug sales;

k. That persons involved in large-scale drug trafficking conceal in their residence and businesses caches of drugs, large amounts of currency, financial instructions, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining transferring, secreting, or the spending of large sums of money made from engaging in narcotic trafficking activities;

l. That when drug traffickers amass large proceeds from the sale of drugs they attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts (particularly businesses dealing with large amounts of cash)

m. That drug traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

n. That drug traffickers take or cause to be taken photographs of them, their associates, their property, and their product. That these traffickers usually maintain these photographs in their possession; and

o. That courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

3. Affiant alleges the facts and circumstances contained in this affidavit show probable cause that **GEORGE LANGFORD** has committed and/or is currently committing offenses involving violations of Title 21, Section 841(a)(1), that is, knowingly and intentionally distributing and possessing with the intent to distribute a controlled substance, Title 21, United States Code, Section 846, that is, conspiracy to distribute and to possess with the intent to distribute a controlled substance, (hereinafter "target offenses"). I am submitting this affidavit in support of search warrants authorizing a search of multiple locations, for which probable cause will be outlined below. Each location will be more particularly described in each Attachment A, for the items specified in each Attachment B hereto, which items constitute

4

instrumentalities, fruits, and evidence of the foregoing violations. For each location, I am requesting authority to search the entire premises, including any detached garages, locked containers, vehicles on the premises registered to or associated with **LANGFORD**, and any computers, cellular telephones and digital media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

4.  This Affidavit is in support of a request for search warrants for the following locations:

1) <u>**2131 Copley Road, Apartment A32, Copley, OH 44320**</u> (**TARGET RESIDENCE 1**) - Based on court-authorized Title III intercepts, precise location tracking, surveillance, and investigation, I believe that **TARGET RESIDENCE 1** is a residence used by **LANGFORD** to store and distribute drugs, and to maintain the proceeds from the sale of drugs. Public documents show that **TARGET RESIDENCE 1** is an apartment complex, with Apartment A32 rented in the name of Novella Hayes, a relative of **LANGFORD's** wife SACOYA HAYES. Precise location tracking, surveillance and investigation show **GEORGE LANGFORD** currently lives at the residence with SACOYA HAYES.

2) <u>**957 Bank Street, Akron, OH 44305**</u> (**TARGET RESIDENCE 2**) - Based on court-authorized Title III intercepts, precise location tracking, surveillance, and

5

investigation, I believe that **TARGET RESIDENCE 2** is a residence used by **LANGFORD** and his criminal associate(s) to store and distribute drugs. **TARGET RESIDENCE 2** is a single family home. Government records and an Akron Police Department Incident Report show the home is occupied by BRIANNA MCKNIGHT, the sister of **LANGFORD's** criminal associate ALEXANDER QUARTERMAN.

### BASIS OF INFORMATION

5.   Except as otherwise noted, the information set forth in this Affidavit has been provided to me by other law enforcement agents or officers. Unless otherwise noted, whenever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken, or whose report I have read and reviewed. Likewise, information resulting from physical surveillance, except where otherwise indicated, does not necessarily set forth my observations, but rather has been provided directly or indirectly through law enforcement officers who have conducted the surveillance. Moreover, any information pertaining to vehicles and/or registrations, personal data of subjects, and records checks has been obtained through the Law Enforcement Automated Data System ("LEADS") from the State of Ohio, the Ohio Law Enforcement Gateway from the Attorney General's Office of the State of Ohio, the National Crime Information Center ("NCIC")

computers, and records of Assessors' Offices, including those in Summit County, Ohio.

6.    Because this Affidavit is being submitted for the limited purpose of securing authorization for search warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the foundation for the requested search warrants.

## BACKGROUND

7.    Since approximately April of 2019, FBI Agents and Task Force Officers in the cities of Huntington, West Virginia, Williamsport, Pennsylvania, and Akron, Ohio have been conducting an investigation into a group of individuals distributing large quantities of crystal methamphetamines in their jurisdiction(s). The investigation revealed that one of the primary sources of supply is an individual from Akron, Ohio known to law enforcement officers in West Virginia as "Him Him." A coordinated effort between Ohio and West Virginia law enforcement officers revealed that "Him Him" is actually **GEORGE LANGFORD. LANGFORD** has an extensive criminal history dating back to 2011 with multiple convictions related to drug trafficking and weapons offenses.

8. Since July, 2019, investigation has included court-authorized precise location and Title III wire and electronic intercepts of **LANGFORD's** cellular telephone(s).

9. On July 8, 2019, the Honorable Robert C. Chambers, United States District Court Judge for the Southern District of West Virginia, authorized interception of wire and electronic communications over West Virginia Target Telephone One (WVTT-1), a telephone used by **GEORGE LANGFORD**. Extensions for continued interception of LANGFORD's WVTT-1 were authorized on August 6, 2019 and August 30, 2019. It is anticipated that interceptions of **LANGFORD's** cellular telephone will terminate on September 28, 2019.

10. In conjunction with said techniques, law enforcement has conducted extensive physical surveillance of **LANGFORD** and his criminal associates during intercepted drug transactions. One such associate has been identified as ALEXANDER QUARTERMAN aka "Al".

11. On October 9, 2018, the United States Marshal's Service Northern Ohio Violent Fugitive Task Force was conducting a surveillance at 243 Uhler Street in Akron, Ohio when they observed ALEXANDER QUARTERMAN, JR., and JIMMIE HIGHTOWER LOLLAR arrive at the residence in a vehicle. As Deputy Marshals made contact with the pair, a bag of what appeared to be fentanyl was observed in plain view and seized. Based upon this, the Akron Police Department Street Narcotics Uniform Detail obtained and executed

a state search warrant for the premises. Once inside the residence, Officers located **GEORGE LANGFORD** along with three handguns and a rifle. **LANGFORD** was convicted of having weapons under disability and was sentenced to 18 months probation, which remains in effect to this date.

12. As will be shown below, **LANGFORD** and QUARTERMAN, JR. remain criminal associates, with **LANGFORD** residing at and utilizing **TARGET RESIDENCE 1** to store and distribute drugs and proceeds from drug sales. In addition, **LANGFORD** and QUARTERMAN utilize **TARGET RESIDENCE 2** to store and distribute drugs.

## FACTS AND CIRCUMSTANCES OUTLINING PROBABLE CAUSE for TARGET RESIDENCE 1

13. In July, 2019, investigation identified SACOYA MONE HAYES as the girlfriend of **GEORGE LANGFORD**. Investigation has since revealed that on or about July 29, 2019, HAYES and **LANGFORD** applied for a marriage license in Summit County, Ohio. Public records from the Summit County Court of Common Pleas show HAYES and **LANGFORD** were married on August 12, 2019.

14. On July 11, 2019, interception of **LANGFORD's** WVTT-1 captured a conversation during which HAYES asked **LANGFORD** if they were moving into the apartment that day. **LANGFORD** stated that he was trying to get a bed so they could move in.

15. During additional interceptions of **LANGFORD's** WVTT-1, he referred to the apartment complex as Foxtail Glen. I am familiar with the Foxtail Glen Apartments and their location as 2131 Copley Road, Akron, OH 44320. The apartment complex consists of several two-story buildings with first and second floor apartments. Three separate parking lots serve the complex, with some apartments accessible directly from one of the parking lots, while other apartments are accessed from a courtyard located behind the buildings. The complex is situated directly next to a large pond.

16. Physical surveillance observed **LANGFORD** and/or his known vehicle(s) parked in the lot serving 2131 Copley Road on multiple occasions, with **LANGFORD** appearing from the courtyard portion of the complex prior to entering his vehicle.

17. On July 29, 2019, **LANGFORD** was intercepted on WVTT-1 several times arranging to meet a drug customer at the apartment complex. **LANGFORD** directed the customer to park in the apartment parking lot on the right (east) side because **LANGFORD** stated he had to, "run into my house and grab it." **LANGFORD** added that his "apartment in the back."

18. On August 5, 2019, physical surveillance was being conducted on the east side parking lot of 2131 Copley Road where **LANGFORD's** red SUV rental vehicle was parked. At approximately 10:05 a.m., **LANGFORD** appeared from the courtyard area and entered the red SUV. Surveillance units followed **LANGFORD** to the Belden

Village Mall in Canton, Ohio where he parked in the lot. At or about 10:37 a.m., a silver Nissan bearing a West Virginia license plate was observed in the lot. The Nissan was occupied by a lone male. At or about 10:44 a.m., the male from the Nissan was observed meeting with **LANGFORD**. Law enforcement Officers observed an exchange between the two. The male from the Nissan provided **LANGFORD** with what appeared to be a shoe box. **LANGFORD** provided the male from the Nissan with a shopping bag. **LANGFORD** then departed the area.

19. At approximately 11:16 a.m., **LANGFORD** was observed returning to the east side parking lot of 2131 Copley Road. **LANGFORD** exited the driver's door of the red SUV and was carrying an orange Nike shoe box. **LANGFORD** then walked west through the apartment complex toward the courtyard.

20. At approximately 11:40 a.m., a traffic stop was conducted on the Nissan by the Ohio State Highway Patrol. During the course of the stop, Troopers recovered approximately five (5) pounds of suspected crystal methamphetamine located in a plastic shopping bag on the passenger side floor board. The driver of the vehicle, whose identity is known to me, and will hereinafter be referred to as Cooperating Defendant 1 (CD-1), was arrested.

21. CD-1, whose criminal history includes traffic and administrative offenses, provided information to Agents in an effort to receive prosecutorial consideration. CD-1 advised that

on that date, CD-1 had purchased approximately five pounds of crystal methamphetamine from a man he knew only as "Cuzz." CD-1 described "Cuzz" as a black male with a beard. I am familiar with **GEORGE LANGFORD's** appearance and am aware that **LANGFORD** is a black male and typically wears a beard, including on that date as observed by surveillance units. "Cuzz" once texted his address to CD-1 as "2131 Copley Rd, Akron, Ohio." CD-1 advised that he had been provided the drugs earlier in the day by "Cuzz" in the parking lot of the Belden Village Mall. CD-1 had provided "Cuzz" with $27,000 inside of a Nike shoe box. CD-1 observed Cuzz driving a Maroon SUV type vehicle.

22. Based on the surveillance showing **LANGFORD** leaving the apartment complex and traveling directly to meet CD-1 at the shopping mall, law enforcement observing LANGFORD and CD-1 exchange a shoe box and shopping bag, CD-1's description of "Cuzz", and law enforcement observing LANGFORD return to the apartment complex with a shoe box, there is probable cause to believe the drugs came from **LANGFORD** at **TARGET RESIDENCE 1**. Furthermore, since CD-1 advised the money for the drugs was in the shoe box, there is probable cause to believe that LANGFORD maintains the proceeds from his drug sales at **TARGET RESIDENCE 1**.

23. On August 22, 2019, FBI physical surveillance observed SACOYA HAYES, the then-wife of **GEORGE LANGFORD**, entering 2131 Copley Road, Apartment A32 (**TARGET RESIDENCE 1**) after **LANGFORD**

12

returned to the complex. Apartment A32 is located in the courtyard portion of the Foxtail Glen Complex. On August 23, 2019, the Copley Police Department provided information that Apartment A32 is leased to NOVELLA D. HAYES, dob XX/XX/1953.

24. Public records show that SACOYA HAYES is a listed relative of NOVELLA HAYES.

25. On September 13, 2019, physical surveillance was being conducted in the east side parking lot of 2131 Copley Road. Interception of **LANGFORD's** WVTT-1 indicated **LANGFORD** was expecting one or more individuals from West Virginia to arrive and obtain heroin/fentanyl.

26. At approximately 3:35 p.m., a gray Nissan bearing a West Virginia license plate was observed in the eastern parking lot. At approximately 3:51 p.m., the gray Nissan departed the lot.

27. At approximately 4:10 p.m., a traffic stop was conducted on the Nissan by the Ohio State Highway Patrol. During the course of the stop, Troopers discovered approximately 300 grams of suspected heroin/fentanyl. The driver of the vehicle, whose identity is known to me, and will hereinafter be referred to as Cooperating Defendant 2 (CD-2), was arrested.

28. CD-2 was identified as being a wanted person by the United States Marshals Service. CD-2 is on federal supervised release for a weapons offense. CD-2's extensive criminal history also includes offenses involving weapons and crimes of violence.

CD-1 provided information to law enforcement in an effort to receive prosecutorial consideration.

29. CD-2 advised they had just obtained the heroin from an apartment on Copley Road in Akron, Ohio. CD-2 stated the apartment complex was by a lake on the right (north) side of the road. CD-2 received the heroin from a male only known to CD-2 as "Con". CD-2 described "Con" as a black male with a beard and dark skin. CD-2 stated that "Con" had two children in the apartment and "Con" was carrying a weapon on his person.

30. Based on the information that **LANGFORD** was expecting one or more individuals from West Virginia to pick up heroin/fentanyl, surveillance of **LANGFORD's** apartment complex from which CD-2 departed, and CD-2's description of the location and person from whom CD-2 obtained the drugs, there is probable cause to believe the drugs came from **LANGFORD** at **TARGET RESIDENCE 1**.

## FACTS AND CIRCUMSTANCES OUTLINING PROBABLE CAUSE for TARGET RESIDENCE 2

31. Physical surveillance throughout the course of the investigation has placed **LANGFORD** and/or his known rental vehicles in the driveway and behind a house identified as 957 Bank Street, Akron, OH 44305 (**TARGET RESIDENCE 2**).

32. A review of records maintained by the Office of the Ohio Attorney General revealed that BRIANNA MCKNIGHT was issued an Ohio

Permanent Identification, TU781585, on 05/25/2019. On that identification, MCKNIGHT listed her home address as 957 Bank Street, Akron, Ohio. An additional review of records identified MCKNIGHT's mother as CAMESHA DANIELL MCKNIGHT.

33. On July 20, 2019 at or about 4:47 p.m., **LANGFORD** was intercepted on WVTT-1 discussing drug trafficking with Al Last Name Unknown (LNU). Al LNU was utilizing a telephone number of (234) 716-3162.

34. On August 2, 2019 at or about 8:24 p.m., **LANGFORD** was intercepted on WVTT-1 again discussing a drug transaction with Al LNU over (234) 716-3162.

35. On August 19, 2019 between approximately 3:12 p.m. and 5:54 p.m., **LANGFORD** used WVTT-1 to make phone calls and exchange text messages with an apparent drug customer who wanted "two of em" for "5". Based on my training and experience and the facts of the investigation thus far, **LANGFORD** agreed to sell UM two ounces of methamphetamine for $500. At approximately 5:18 p.m., **LANGFORD** placed an outgoing call to the customer and asked if they wanted to come to "my spot", providing the customer the address as 957 Bank Street and told the customer to pull all the way to the back. At 5:54 p.m., the customer called **LANGFORD** and stated that he was at the side door (of 957 Bank Street).

36. On August 22, 2019, between approximately 7:37 p.m. and 9:24 p.m., **LANGFORD** used WVTT-1 to make phone calls and exchange

text messages with an apparent drug customer who wanted $40 worth of "slow" (heroin). **LANGFORD** agreed and told the customer to come to the east side (of Akron) on Bank Street. At 9:20 p.m., the customer called **LANGFORD** and stated they were two minutes away from Bank Street and had $40. At 9:24 p.m., **LANGFORD** sent a text message to the customer which read, "957."

37. On August 29, 2019 at 8:05 p.m., **LANGFORD** used WVTT-1 to speak to an apparent drug customer who wanted, "one and a half of each (1.5 ounces of methamphetamine and 1.5 ounces of heroin)." **LANGFORD** agreed and directed the customer to Bank Street. At approximately 8:49 p.m., **LANGFORD** advised the customer, "My sister about to pull up right now and let me in."

38. On September 2, 2019 at or about 2:16 p.m., **LANGFORD** was intercepted on WVTT-1 discussing obtaining ounces of methamphetamine from Al LNU, user of (234) 716-3162. During the call, Al LNU indicated that a quantity of drugs were located at his sister's house. Al LNU identified his sister as "Bri." On the same date at 2:28 p.m., **LANGFORD** spoke to Al LNU once again. Al LNU told **LANGFORD** that the police were at his sister's house because someone copied one of "Bri's" keys and came in. Al LNU said that he told "Bri" the "pole (gun)" was behind the TV and "Bri" should shoot her (the person who came in the house).

39. I am aware that on September 2, 2019 at approximately 1:00 p.m., Officers of the Akron Police Department were dispatched

16

to the residence at 957 Bank Street, Akron, Ohio in response to a reported domestic disturbance. The listed complainant on the call was BRIANNA MCKNIGHT and it was in regards to MCNIGHT's ex-girlfriend entering the house with an unauthorized key.

40. Investigation shows there is probable cause to believe the individual Al LNU intercepted over **LANGFORD's** WVTT-1 is **LANGFORD's** criminal associate ALEXANDER QUARTERMAN, JR. On June 14, 2019, QUARTERMAN was issued an Ohio Temporary Identification, TY002054. QUARTERMAN provided an address of 1815 S. Arlington Street, Akron, Ohio. An additional review of records identified QUARTERMAN's mother as CAMESHA DANIELL MCKNIGHT, the same mother as BRIANNA MCKNIGHT.

41. A search of public social media pages indicates that QUARTERMAN maintains an account under the name of "Casanova Wright." On the Casanova Wright page there is a picture of QUARTERMAN with BRIANNA MCKNIGHT. The photo is labeled, "Siblings."

42. I am aware that on September 2, 2019 at approximately 3:09 p.m., **LANGFORD** and Al LNU made arrangements to meet at MCKNIGHT's house (**TARGET RESIDENCE 2**).

43. Based on the surveillance of **LANGFORD** conducting apparent drug transactions, intercepts of **LANGFORD** utilizing WVTT-1 to direct drug customers to **TARGET RESIDENCE 2** to obtain drugs, and **LANGFORD's** intercepts with QUARTERMAN, JR. discussing drugs

17

and a weapon being stored at **TARGET RESIDENCE 2**, I believe there is probable cause that **LANGFORD** and his criminal associates utilize TARGET RESIDENCE 2 to store and distribute drugs.

## CONCLUSION

44. Based on the foregoing information I believe there is probable cause to believe that **GEORGE LANGFORD** and others are involved in committing offenses involving violations of Title 21, United States Code, Section 846, that is conspiracy to distribute and to possess with the intent to distribute a controlled substance and violations of Title 21, United States Code, Sections 841(a)(1), that is knowingly and intentionally distributing and possessing with the intent to distribute a controlled substance. Furthermore, I respectfully submit that there is probable cause for the issuance of search warrants for **LANGFORD's** residence (**TARGET RESIDENCE 1**) and LANGFORD and QUARTERMAN's apparent stash house (**TARGET RESIDENCE 2**), including any detached garages, locked containers, vehicles on the Premises registered to or associated with **LANGFORD** or his associates, and any computers, cellular telephones and digital media located therein where the items specified in Attachment B, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

18

45. Based upon training and experience, I am aware that persons involved in the illicit distribution of controlled substances nearly always attempt to conceal their identities, the locations at which drug transactions take place, the locations where they store their drugs, and the flow of proceeds derived from their illicit drug transactions into "clean" currency. I know that individuals engaged in organized drug distribution and sales maintain contacts with persons from whom they receive or distribute drugs, drug paraphernalia and drug information to include information on others in the local area who are also engaged in the unlawful activity of drug distribution. Further, I am aware that drug traffickers in almost all instances keep papers and records relating to their associates and drug transactions in the residences, including records of receipt and distribution of drugs and money, and they often possess firearms to protect their drug operation. Additionally, I know from training and experience that drug traffickers also often keep the above-described records stored on computers, cellular telephones or digital equipment/media. If computers, cellular telephones or digital equipment/media are discovered, I intend to seize said items and then search or cause to be searched the stored files therein.

46. Based upon my training and experience in drug investigations and in particular this investigation of **LANGFORD**,

it is my opinion that principal members of said crimes retain evidence of their criminal activity in their places of residence, at their storage lockers, or at locations which have been used by them to conduct their criminal activity. Based on the totality of the facts and circumstances set forth in this affidavit and my training and experience, I believe there is probable cause that evidence of distributing and possessing with the intent to distribute a controlled substance, conspiracy to commit distributing and possessing with the intent to distribute a controlled substance, proceeds of drug trafficking, and contraband or documents related to the sale of drugs are located in the aforementioned locations. Therefore, I am requesting permission to search the Premises and the surrounding grounds, any garages, storage areas, trash containers, sheds, and outbuildings of any kind, any computer equipment, cellular telephones, or other electronic storage devices found at any of the Premises, and all vehicles at the Premises registered to, known to be utilized by, or associated with **LANGFORD**.

47. I, therefore, respectfully request that the attached warrants be issued authorizing the search and seizure of the items listed in Attachment B.

## REQUEST FOR SEALING

48. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

SA Christopher Fassler

Federal Bureau of Investigation

Sworn to and subscribed before me this 24th day of September, 2019.

Kathleen B. Burke

U.S. Magistrate Judge

21

Attachment A

DESCRIPTION OF LOCATIONS TO BE SEARCHED

This attachment describes the locations to be searched:

1. **2131 Copley Road, Apartment A32, Copley, OH 44320,** (primary residence of **GEORGE LANGFORD**) is a lower level courtyard unit of a multi-unit apartment building within a series of buildings within the Foxtail Glen Apartments, 2131 Copley Road, Copley, Ohio. The unit to be searched is on the first floor, with "A32" clearly marked as such on the exterior. The structure is a multiple unit residence with an exterior of a mixture of tan and gray siding trimmed in white.

2. **957 Bank Street, Akron, OH 44305,** (primary residence of BRIANNA MCKNIGHT and stash house for **LANGFORD** and QUARTERMAN, JR.) is a single family dwelling, suspected to be a rental property owned by another unrelated party. The property is a two-story home with tan aluminum/vinyl siding and reddish-brown shingles. According to property records, 957 Bank Street has 6 total rooms with 3 bedrooms, 1 full bathroom, and a full basement. The house is situated

along the east side of Bank Street and has an asphalt
driveway on the north side of the home.

Attachment B

LIST OF ITEMS TO BE SEIZED

1. Books, records, receipts, notes, ledgers, and other papers (and/or computer memory equivalents) related to the manufacture, purchase, transportation, sale or distribution of controlled substances.
2. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, including but not limited to names of, addresses for, and/or telephone numbers of individuals known to be involved in drug trafficking.
3. Books, records, receipts, bank statements, and records, money drafts, money orders and cashier's check receipts, bank checks, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of United States Currency.
4. United States Currency in excess of $2000
5. Photographs, in particular, photographs of controlled substances, assets, and adult associates.
6. Cellular telephones and computer memory media capable of storing telephone numbers or other numbers and addresses of additional associates involved in the illegal distribution of narcotics.
7. Tickets, papers, itineraries, schedules, notes, receipts, and other items relating to domestic or international travel.
8. Titles, and evidence of ownership and/or other papers or records of acquisition of automobiles, and vehicles, real estate, and any other assets of value.
9. Utility and telephone bills, cancelled envelopes, keys and other indicia of occupancy, residency or ownership of the searched premises, or other premises or storage lockers.
10.    Illegal narcotics to include but not limited to crystal methamphetamine, heroin, cocaine, and/or any other items used to measure, weigh, cook, package, and/or distribute said items.
11.    Firearms and/or ammunition used or suspected to be used in drug trafficking offenses.